UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WILLIAM RUDD,

                    Plaintiff,                                  Hon. Paul L. Maloney

v.                                                    Case No. 1:20-cv-27

GREGORY C. PITTMAN,

                    Defendant.

_____/

## **REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant's Motion to Dismiss.   (ECF No. 8.)   Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendant's motion be **GRANTED,** and Plaintiff's complaint **dismissed**.

## I.   BACKGROUND

Plaintiff, Daniel Rudd, has sued Muskegon County Family Court Judge Gregory Pittman, who presided over a child custody dispute between Rudd and his ex-wife.   Rudd insists that he is not challenging the family court judgment.   (ECF No. 1. At PageID.9.)   In fact, Rudd notes that Judge Pittman "afforded [him] favorable rulings on all substantial custody and parenting time issues."   (ECF No. 18 at PageID.200.)   Instead, Rudd seeks damages against Judge Pittman for his disparaging, demeaning, and threatening remarks and attitude toward Rudd because of his First Amendment petitioning activity during the custody case, prospective relief in the form of a declaratory judgment that Judge Pittman has violated and continues to violate Rudd's constitutional rights, and an injunction precluding Judge Pittman from continuing to engage in the alleged illegal conduct.   Rudd asserts claims against Judge Pittman pursuant to 42 U.S.C. § 1983

for violations of his First Amendment free speech rights and right of access to the courts, retaliation, violation of his of his right to equal protection, and a state-law claim for intentional infliction of emotional distress.

The following facts are taken from Rudd's complaint.  In August 2014, Judge Pittman awarded Rudd sole legal and physical custody of his children based on a report by a court-appointed therapist.  The expert issued "extremely favorable findings" pertaining to Rudd's "conduct, honesty, parental fitness and good judgement."  (ECF No. 1 at pageID.3.)  Judge Pittman had previously entered a series of orders providing specific therapeutic requirements for Rudd's ex-wife and a process to assess her progress toward receiving parenting time.  Rudd consistently urged Judge Pittman to adhere to the statutory requirements before allowing further litigation to proceed and insisted that Judge Pittman enforce his orders and sanction Rudd's ex-wife for violations.   When Judge Pittman allegedly refused to do so, Rudd turned to the Michigan Judicial Tenure Commission and the Michigan Court of Appeals.   (*Id.*)

Rudd alleges that, over time, Judge Pittman developed a strong distaste for Rudd's litigation activities and began using the court proceedings to discourage, punish, and suppress Rudd's conduct in the case.   For example, in July 2013, Judge Pittman rebuked Rudd for seeking emergency assistance from the police.[1]   In November 2013, after Rudd alerted Judge Pittman that his ex-wife's attorney had committed serious misconduct, Judge Pittman strongly discouraged Rudd from ever asserting that an attorney's advocacy was illegal or unethical.   And in December 2014, Judge Pittman impulsively "play[ed] his hunch" and experimented with modifications to the

---

[1] Rudd previously filed an action in this Court against his ex-wife's attorney and her law firm, law enforcement officers, and officials with the City of Norton Shores relating to this and other events. *See Rudd v. City of Norton Shores, et al.*, No. 1:18-CV-124 (W.D. Mich.).   Rudd's claims were dismissed, and the case is currently on appeal to the Sixth Circuit.

established orders.    (*Id.* at PageID.4.)    Rudd objected because Judge Pittman acted without affording the parties notice and an opportunity to present evidence.    Rudd claims that Judge Pittman berated and disparaged him for raising these concerns, noted that Rudd was "unstable" as a parent for failing to forgive his ex-wife "70 times 7" for her substance abuse issues, and warned Rudd that his objections could be grounds for deeming Rudd an unfit custodial parent.[2]    (*Id.* at PageID.5.)    Instead of accepting Rudd's pleas to follow the law and the statutory framework, Rudd alleges Judge Pittman invoked "his *spiritual gift* of discernment."    (*Id.* (italics in original).)    When Rudd insisted that Judge Pittman instead rely on evidence, Judge Pittman deemed Rudd's advocacy "litigious."    However, Judge Pittman never made a ruling or finding that Rudd's filings were frivolous or in bad faith.    (*Id.*)

In an August 25, 2017 opinion, Judge Pittman issued a cursory denial of Rudd's long-standing requests for a hearing on his motions for attorney's fees.    While Judge Pittman acknowledged Rudd's good faith advocacy on behalf of his children, he displayed his animus toward Rudd by citing his "litigiousness" as a basis for denying Rudd's motions for litigation costs and contempt sanctions.    Judge Pittman also delayed setting child support from May 2014 through August 2017 because he disapproved of Rudd's litigation activity.

On January 13, 2017, Judge Pittman adjourned a hearing and ordered Rudd to appear in his office, where he confronted Rudd "man to man."    Rudd's ex-wife's attorney was also present. Rudd objected to the in-chambers meeting and repeatedly requested that they return to open court. Judge Pittman responded that he was in charge and was going to address Rudd "man to man." Judge Pittman then expressed disdain for Rudd and the burden of presiding over Rudd's case.

---

[2] Rudd proceeded through counsel for several years but began to represent himself in approximately 2015.

When Rudd threatened to file a motion for recusal, Judge Pittman said that he would deny it, observing that "there was no other judge [he] *hated enough* to saddle with [Rudd's] case."  (*Id.* at PageID.11 (italics in original).)   Judge Pittman repeatedly warned Rudd that he could disregard findings he had made several years ago that had served as the basis for his decision to award Rudd full custody of his children.   Judge Pittman said that, notwithstanding past orders, he would not allow Rudd to function as the parent with sole custody, even though there was no indication that Rudd's decision-making or parenting was inappropriate.  (*Id.* at PageID.12.)   At the conclusion of this meeting, Judge Pittman said that he would be setting a settlement conference in the future after he had an opportunity to review the record.  (*Id.* at PageID.13.)

On August 7, 2017, Rudd left a "judge's copy" of a motion he had recently filed at the reception counter of the probate court.   Seeing Rudd, Judge Pittman asked his staff to call Rudd back to the reception area.   Judge Pittman proceeded to make hostile and unnecessary remarks and acknowledged that Rudd's requests for attorney's fees and child support had been ignored for some time without a hearing.   Judge Pittman said that he had instructed his staff to not set hearings, indicated his assumption that Rudd's filings were nonsensical, and told Rudd not to request hearings but instead wait to see if any hearings would be allowed.  (*Id.* at PageID.14–15.) Judge Pittman also told Rudd that he "needed to 'find a hobby.'"   As Judge Pittman walked down the hallway leafing through Rudd's filings, Rudd overheard him mutter "what the FUCK?!?"  (*Id.* at PageID.15.)

Rudd appealed Judge Pittman's August 25, 2017 Opinion and Final Order regarding Rudd's petitions for litigation costs and contempt sanctions and Rudd's motion to disqualify.   On December 18, 2018, the Michigan Court of Appeals issued an opinion affirming Judge Pittman's ruling on the motion to disqualify but reversing, in part, his decision on Rudd's motion for

litigation costs and contempt sanctions.  (ECF No. 8-3.)  Regarding disqualification, the court noted that "the record fails to show that the judge had a personal or extrajudicial bias against plaintiff as decisions were made by the judge that were favorable to both plaintiff and defendant's legal positions."  (*Id.* at PageID.99.)  The court remanded the case to Judge Pittman for an evidentiary hearing on Rudd's costs and attorney's fees.  On remand, Judge Pittman awarded Rudd $4,350 in costs and fees, which the Michigan Court of Appeals affirmed on appeal.  (ECF No. 8-4.)

In May and June 2018, Rudd prepared paperwork for a Friend of Court child support recommendation for Judge Pittman's review.  Rudd contacted Judge Pittman's office for a hearing date, but his requests were ignored.  To preserve his request, Rudd filed his submission just before the time for doing so expired.  Instead of scheduling a hearing, Judge Pittman sought to have Rudd's filings retroactively rejected by the clerk on the basis that Rudd had failed to schedule a hearing with Judge Pittman's office.  (ECF No. 1 at pageID.17.)

## II.  Motion Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating its assertions in a light most favorable to Plaintiff to determine whether it states a valid claim for relief.  *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2000).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).   This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   *Id.*   If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"   *Id.*   As the Court further observed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.* at 678-79.

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any attached exhibits, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided they are referenced in the complaint and central to the claims therein.   *See Bassett v. Nat'l Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008).

### III.   Discussion

#### A.      Standing

In his reply, Judge Pittman argued for the first time that Rudd lacks standing under Article III because Rudd suffered no "injury in fact."   The Court allowed Rudd to file a sur-reply limited to the issue of standing.   (ECF No. 27.)

Standing is "the threshold question in every federal case."   *Warth v. Seldin*, 422 U.S. 490, 498 (1975).   To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be "fairly traceable" to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury.   *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).   An injury in fact must

6

be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).    In the First Amendment context, the Supreme Court has held that mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)).    A concrete harm exists where it is shown that a challenged statute has been or will be enforced against the plaintiff. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019).    Moreover, "[e]ven if an official lacks actual power to punish, the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill." *Id.* (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963)).

In *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602 (6th Cir. 2008), the plaintiff was a high school student challenging his school's policy prohibiting students from making stigmatizing or insulting comments regarding another student's sexual orientation.    Faced with the policy, the plaintiff refrained from proclaiming his religious beliefs against homosexuality. *Id.* at 605.    The plaintiff alleged that the policy chilled his speech, but the court disagreed, observing that the plaintiff's silence was self-imposed.    The school district had stated that the policy would not be interpreted as applying to speech otherwise protected by the constitution, and there was no evidence that the school district threatened to punish, or would have punished, the plaintiff for his speech. *Id.* at 610.    The court observed that the plaintiff had asked it "to find a justiciable injury where his own subjective apprehension counseled him to choose caution and where he assumed . . . that were he to speak, punishment would result." *Id.*    The court found that *Laird v. Tatum*, 408 U.S. 1 (1972), dictated this result.    In *Laird*, the Court held that the plaintiffs' asserted injury based on what they perceived as the Army's inappropriate surveillance of peaceful civilian

political activity was not enough to establish the requisite injury-in-fact for Article III purposes. *Id* at 13–14.   Inquiring what "more" beyond subjective chill could demonstrate a proper injury-in-fact, the *Morrison* panel gave some examples:   a temporary restraining order, a lengthy investigation by a government agency into the plaintiff's activities and beliefs, and seizures of a plaintiff's membership lists and other property.   521 F.3d at 609 (citing cases).   In short, the court explained, "subjective chill requires some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact."   *Id.*

Here, Rudd has alleged the "more" beyond a subjective chill that is required to show an injury-in-fact.   That is, Rudd alleges that, in response to his petitioning activity, Judge Pittman delayed considering, or refused to rule on, his requests for fees and contempt sanctions and child support obligations.   (ECF No. 1 at PageID.8, 16–17.)   Rudd further alleges that, in response to his activities, Judge Pittman threatened to disregard, or reconsider, his earlier findings supporting the award to Rudd of sole legal and physical of his children.   (*Id.* at PageID.10–12.)   These are the types of threats and actions that were absent in *Morrison* that elevate Rudd's claim beyond mere subjective chill.[3]

---

[3] Judge Pittman also argues that the *Rooker-Feldman* doctrine bars Rudd's claims.   The doctrine, rooted in the Supreme Court's decisions in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), provides that lower federal courts are without authority to review final judgments of state courts.   This is because "only the Supreme Court of the United States has the jurisdiction to review state court decisions."   *Coleman v. Governor of Michigan*, 413 F. App'x 866, 870 (6th Cir. 2011) (citing *Rooker*, 263 U.S. at 416). The Supreme Court has clarified that the doctrine is limited to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review of those judgments."   *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).   In light of *Exxon Mobile*, the Sixth Circuit "distinguishe[s] between plaintiffs who bring an impermissible attack on a state court judgment—situations in which *Rooker-Feldman* applies—and plaintiffs who assert independent claims before the district court—situations in which *Rooker-Feldman* does not apply."   *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 606 F.3d 301, 309 (6th Cir. 2010).   Rudd does not challenge Judge Pittman's orders.   Instead, Rudd's claims are based on Judge Pittman's

B.      **Absolute Judicial Immunity**

Although Rudd has Article III standing, his claims against Judge Pittman in his individual

capacity are barred the doctrine of absolute judicial immunity.

It is well established that a judge is absolutely immune from suit seeking monetary relief,

so long as the judge was performing judicial functions.  *See Mireles v. Waco*, 502 U.S. 9, 9–10

(1991).  "[J]udicial immunity is an immunity from suit, not just from ultimate assessment of

damages."  *Id.* at 11.  The "immunity applies to actions brought under 42 U.S.C. § 1983 to

recover for alleged deprivation of civil rights."  *Stern v. Mascio*, 262 F.3d 600, 606 (6th Cir.

2001).   A judge is not immune (1) where the judge's alleged actions were not taken in the judge's

judicial capacity, or (2) where the actions, although judicial in nature, were taken in the complete

absence of jurisdiction.  *Mireles*, 502 U.S. at 11–12.  "[T]he scope of the judge's jurisdiction

must be construed broadly where the issue is the immunity of the judge.  A judge will not be

deprived of immunity because the action he took was in error, was done maliciously, or was in

excess of this authority; rather, he will be subject to liability only when he has acted in the 'clear

absence of all jurisdiction.'"  *Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978) (quoting *Bradley*

*v. Fisher*, 80 U.S. 335, 351 (1981)).   A functional analysis is applied to determine whether an act

is judicial in nature.   "Whether an act is judicial depends on the nature and function of the act, not

the act itself."  *Barnes v. Winchell*, 105 F.3d 1111, 1116 (6th Cir. 1997) (internal quotation marks

omitted) (quoting *Mireles*, 502 U.S. at 13).   The analysis involves two considerations:   "(1)

looking to the nature of the act itself, whether the act is a 'function normally performed by   judge''

---

treatment of, and attitude toward, Rudd during the custody proceeding.  The *Rooker-Feldman*
doctrine does not apply.

and (2) regarding the expectations of the parties, whether the parties 'dealt with the judge in his judicial capacity.'"  *Id.* (quoting *Mireles*, 502 U.S. at 12).

The majority of Judge Pittman's acts Rudd describes in his complaint are, without question, acts that fall squarely within a judge's traditional function of deciding cases—issuing opinions and orders, holding hearings, setting deadlines, and managing the case before him.  Rudd contends that two acts in particular constitute non-judicial acts:  (1) the January 13, 2017 in-chambers meeting in which Judge Pittman confronted Rudd "man to man" and berated him while Rudd's ex-wife's counsel was present; and (2) the August 7, 2017 confrontation in the courthouse as Rudd was dropping off a judge's copy of a motion he filed.  Contrary to Rudd's characterization, Judge Pittman acted in his judicial capacity in both instances.  First the January 13, 2017 meeting occurred in chambers immediately following a hearing that Judge Pittman had adjourned in order to address Rudd about his conduct in the case.  *See Winters v. Jordan*, No. 2:09-cv-0052, 2010 WL 2838633, at *10 (E.D. Cal. July 20, 2010) ("The actions occurred while Judge Anderson was either in the courtroom or in chambers, they are related to cases before the court, and plaintiffs' allegations arose out of an interaction with Judge Anderson while he was acting in his judicial capacity."); *Back v. Kittrell*, No. 07-0638-KD-M, 2008 WL 5377723, at *6 (S.D. Ala. Dec. 16, 2008) ("talking with counsel in chambers" is an "act[] typically performed by a judge").  The fact that Judge Pittman told Rudd that he wanted to address him "man to man," demeaned and threatened him, and expressed disdain for the burden of presiding over Rudd's case does not make the meeting any less of a judicial act.  As the Supreme Court has noted in the context of judicial bias, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display," come with the territory when dealing with judges, who are no less immune to human emotions than the litigants before them.

*Liteky v. United States*, 510 U.S. 540, 555–56 (1994); *see also Bright v. Gallia Cty.*, 753 F3d. 639, 649–50 (6th Cir. 2014) (holding that absolute judicial immunity applied even though "Judge Evans's actions were petty, unethical, and unworthy of his office" because he had subject-matter jurisdiction over the underlying cases). Finally, by Rudd's own account, Judge Pittman told the parties that he would be scheduling a settlement conference—something that judges do routinely. While the August 7, 2017 confrontation was *ex parte* and did not occur in the courtroom or Judge Pittman's chambers, it did occur in the courthouse, and the conversation pertained directly to the case: Judge Pittman told Rudd not to request hearings on his motions and that he would schedule hearings if he deemed them necessary. Hence, the discussion related to management of the proceeding, which is "unquestionably a judicial function." *Miller v. Crabtree* (*In re Miller*), No. 11-26914, 2011 WL 6217344, at *2 (Bankr. D. Colo. Dec. 14, 2011); *see Thompson v. Duke*, 882 F.2d 1180, 1184 (7th Cir. 1989) ("In the judicial context, scheduling a case for hearing is part of the routine procedure in any litigated matter. However, the fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function.").

Rudd further argues that he has alleged that Judge Pittman engaged in administrative acts to effectuate adverse actions against Rudd. However, the alleged administrative acts to which Rudd refers—allowing Rudd's numerous requests for relief to languish for years and instructing his staff to not schedule hearings on Rudd's motions—pertained to Rudd's individual case rather than to an administrative matter concerning the operation of the court. *See Forrester v. White*, 484 U.S. 219, 229 (1988) (stating that administrative acts include those "involved in supervising court employees and overseeing the efficient operation of a court"); *Sibley v. U.S. Supreme Court*, 786 F. Supp. 2d 338, 343 (D.D.C. 2011) (holding that the Supreme Court Justices' failure to rule on the plaintiff's petition for rehearing and Justice Thomas's failure to timely rule on a motion

were acts that occurred in the Justices' judicial capacities).   Finally, Rudd argues in connection with his allegations in Count 4 concerning his motion to disqualify that Judge Pittman acted outside of his judicial capacity and exerted "governmental influence" in directing Chief Judge Marietti to disregard certain filings in deciding Rudd's motion for recusal/disqualification.   Again, the undersigned disagrees.   Judge Pittman was still acting in his capacity as a judge dealing with a case before him, even if his actions violated the Michigan Court Rules.   *See Iannucci v. Switalski*, No. 16-2534, 2017 WL 5186342, at \*1 (6th Cir. Apr. 10, 2017) ("There is no exception to absolute judicial immunity based on error by a judge in performing an act in a judicial capacity, even if the judge acted maliciously or in excess of his authority.").

Accordingly, Rudd's claims against Judge Pittman in his individual capacity should be dismissed.

### C.    Official Capacity Claims—Declaratory Judgment

Judge Pittman argues that Rudd's official capacity claims are barred by the Eleventh Amendment.   Rudd does not dispute that his official capacity claims for damages are barred by the Eleventh Amendment.   He argues, however, that he may still obtain declaratory relief against Judge Pittman pursuant to *Ex parte Young*, 209 U.S. 123 (1908).   *See S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008) (noting that "[u]nder the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law").   But this argument faces several obstacles.

First, Rudd must establish separate standing to seek prospective declaratory relief.   *Barber v. Miller*, 809 F.3d 840, 849 (6th Cir. 2015 (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).   To establish declaratory judgment standing, Rudd must show "that the 'threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'"   *Id.* (quoting

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013))).    There is no indication that any issue is pending in the proceeding before Judge Pittman, although Rudd alleges that the proceeding itself is ongoing because Judge Pittman will retain jurisdiction until at least April 2023.    (ECF No. 1 at PageID.9.)

Even if there is a substantial risk that Judge Pittman will be required to decide issues in Rudd's case, the declaratory relief Rudd seeks is too general and speculative.    A declaratory judgment is intended to clarify legal duties for the future, rather than address alleged past harm. *See Amsouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004).    Rudd seeks a declaratory judgment that Judge Pittman "violated and continues to violate [Rudd's] constitutional rights by threatening adverse actions, effectuating adverse actions, and withholding government benefits in response to Plaintiff's protected conduct."    (ECF No. 1 at PageID.10.)    "The Eleventh Amendment does not permit judgments against state officers declaring that they violated federal law in the past."    *Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir. 1995) (internal quotation marks omitted).    As for the parties' future conduct, the Court has no idea—and Rudd cannot say—what Rudd's petitioning activity will be and how Judge Pittman will respond to it such that the Court could meaningfully clarify anything about the parties' future conduct.    *See Grand Trunk W. RR. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (a district court should consider, among other factors, "whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue").

Second, assuming that the custody case is an ongoing state proceeding, as Rudd claims, the Court should abstain from issuing the requested declaratory relief pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).    Under the *Younger* doctrine, a federal court should abstain when: (1) state proceedings are pending; (2) the state proceedings involve an important state interest; and

(3) the state proceedings will afford the plaintiff an opportunity to raise his constitutional claims. *Mann v. Conlin*, 22 F.3d 100, 105 (6th Cir. 1994) (quoting *Nilsson v. Ruppert Bronson & Chicarelli Co.*, 888 F.2d 452, 454 (6th Cir. 1989)).   All three requirements are met.   The child custody proceeding is an ongoing state proceeding that involves important state interests, and Rudd has an adequate opportunity to raise his constitutional claims by way of appellate relief or mandamus from the Michigan Court of Appeals if he believes Judge Pittman is improperly handling the case.

Finally, the Court should exercise its discretion under the Declaratory Judgment Act to decline to issue declaratory relief.   The act "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."   *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241 (1952).   A district court may consider the equities of a situation before issuing a declaratory judgment.   *Samuels v. Mackell*, 401 U.S. 66, 73 (1971).   Here, Rudd is essentially asking this Federal Court to impose its own views of case and litigant management on a state-court judge in a proceeding that involves predominantly state interests.   In other words, Rudd is asking this Court to sit as a super-judicial tenure commission, overseeing Judge Pittman's conduct in Rudd's case.   The Court should decline his request, which would undoubtedly "increase friction between our federal and state courts and improperly encroach upon state jurisdiction."   *Grand Trunk*, 746 F.2d at 326.

### D.    State-Law Claim

Having recommended the dismissal of all of Rudd's federal claims, the undersigned recommends that his claim for intentional infliction of emotional distress be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).   "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims."   *Musson*

*Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996).   In deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).   Here, given that the case is at an early stage and the parties are non-diverse, the foregoing considers weigh in favor of dismissal. *See Ismaiyl v. Brown*, No. 16-4308, 2018 WL 2273671, at *2 (6th Cir. Mar. 22, 2018) (holding that district court "properly declined to exercise supplemental jurisdiction" over the plaintiff's state-law claims after dismissing the federal claims stemming from a child custody dispute).

### III.   Conclusion

For the foregoing reasons, the undersigned recommends that Defendant's Motion to Dismiss (ECF No. 8) be **granted** and that Plaintiff's federal claims be dismissed with prejudice but that his state-law claim be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated: July 28, 2020                                          /s/ Sally J. Berens
                                                            SALLY J. BERENS
                                                            U.S. Magistrate Judge